**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**

| | | |
|---|---|---|
| **ORIGIN FOOD GROUP, LLC.** | ) | **Case No. 25-50268** |
| | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

**INFORMATIONAL BRIEF OF DEBTOR**

***Introduction***

1. Origin is a food co-packing company based out of Statesville, North Carolina that historically focused on ice cream and recently ventured into yogurt.

2. Origin's food packaging and production services are provided at a single facility (hereinafter the "Facility") located in Statesville, North Carolina.

3. Origin does not produce any products under its own name or brand and instead fulfills orders pursuant to contracts, and to specifications, required by vendors.

4. To sustain its business, Origin enters into medium-to-long term contracts with various sellers of dairy product to produce products under that companies label.

5. The contracts that Origin enters into are typically for a term of 12 to 60 months and negotiations for renewal of such contracts occurs 3 to 4 months prior to the end of any given contract.

6. In cases of non-renewal, Origin utilizes the 3 to 4 months prior to the end of any given contract to procure replacement customers.

7. In negotiating each contract, Origin considers the machines currently in its factory and those needed for the job.

8. Changing or upgrading the machinery Origin uses is a substantial investment, but is sometimes necessary to meet the needs or desires of a specific vendor.

9. Origin has previously entered into deals with other vendors whereby the purchase, acquisition, installation, or leasing of certain machinery would be integrated into the general contract for production of goods for the vendor.

10. In such cases whereby the purchase, acquisition, installation, or leasing of machinery is integrated into the contract for the production of goods for the vendor, the terms of such contract clearly delineated ownership and possession of the machinery.

11. Origin further regularly upgrades its machinery in order to increase its capacity and efficiency for products it already develops.

12. Origin further regularly updates its machinery in order to be able to solicit more and different kinds of business.

13. The machinery used in the production of dairy products can be incredibly sophisticated and can take a significant amount of time, between six and fourteen months, to be delivered even after being ordered.

14. If the machinery is customized to a specific product, then the time for machinery to be ordered and delivered to be closer to the fourteen-month end of the time range.

***History***

15. Origin was initially formed on March 8, 2010 under the Yogo Pure Properties, LLC.

16. Initial members of Origin were Barbara Young and Robert Stamey (the "Initial Origin Owners").

17. In or around March 2020, the prior equity owners sold their interest to Halil

Ulukaya, Mostafa Dogan and George Samartzis (the "Origin 2020 Owners").

18. The Origin 2020 Members purchased their interests through closely held single member entities.

19. Halil Ulukaya is the sole remaining owner associated with the Debtor as he holds his interest in the Debtor through Eleni Group, LLC.

20. Mr. Ulukaya has an extensive history and background in the food production industry specifically diary.

21. Mr. Ulukaya relocated his young family from Albany, New York for the sole purpose of the March 2020 acquisition.

22. To facilitate the transaction between the Initial Origin Owners and the Origin 2020 Owners, the parties agreed to a down payment as well as owner financing to which the Initial Origin Owners took a purported security interest in certain real estate as well as personal property, fixtures and equipment.

23. The Debtor's affiliates own the real estate that the Debtor operates its business.

24. Said purported liens related to the 2020 transaction are recorded with the North Carolina Secretary of State as follows: Longitude 80 Dairies, Inc., UCC No. 20200025098K and Treemount Trading Limited, UCC No. 20200025099M.

25. The undersigned has not yet had a full opportunity to fully review all of the pertinent loan documents associated with the 2020 transaction. Consequently, the Debtor reserves the right to challenge the perfection of any liens at a later date. Furthermore, the Debtor reserves the right to challenge the value of the purported collateral allegedly secured and the underlying indebtedness that may be asserted.

***Negotiations with Icelandic***

26. Icelandic is a seller and marketer of Skyr yogurt, but upon information and belief, does not itself produce its own products, instead contracting with companies like Origin for the production of its products.

27. In or around August of 2024, representatives of Icelandic and Origin first began discussing the possibility of Origin producing certain dairy products for Icelandic.

28. Pursuant to the prior alleged discussions, Icelandic and Origin ultimately entered a Manufacturing Agreement dated November 20, 2024 (hereinafter the "Production Contract") whereby Icelandic contracted with Origin for the production of 30-ounce low fat and whole milk plain yogurt.

29. Icelandic and Origin operated exclusively under the Production Contract for three to four months. Origin produced the agreed upon product for Icelandic and Icelandic accepted it without substantial complaint as to the quality or quantity.

30. The quantity and quality of the product produced by Icelandic was such that Icelandic and Origin began negotiating a second agreement whereby Origin would produce 16-ounce low fat and whole milk plain yogurt for Icelandic.

31. However, this second agreement would require Origin to acquire certain specialized equipment.

32. In February of 2025, while negotiations for the second contract were pending and while the parties were operating pursuant to the Production Contract, Icelandic approached Origin about expanding their level of involvement from simply the Production Contract to a complete takeover of Origin by Icelandic.

33. Icelandic stated that its intentions were to buyout Origin and its plant and to keep

on key members of the Origin ownership and management team to run the plant.

34. Icelandic emphasized that it was important to move quickly in the opening stages, in part, because both it and Origin were "preparing to make pretty significant capital investments in additional equipment."

35. Icelandic and Origin began the process of negotiating a letter of intent for Icelandic to purchase Origin which proceeded from February 11, 2025 through and until June 12, 2025.

36. At all times during the negotiation, Icelandic's stated intention was to undertake a complete asset purchase of all of Origin's assets in place and takeover the facility.

37. Icelandic's stated intention was not to purchase any of Origin's ongoing business, outstanding contracts, or otherwise takeover Origin's business. Instead, Icelandic's stated intent was to use Origin's facility to produce exclusively Icelandic products.

38. While negotiations regarding the final terms of the letter of intent were pending, Icelandic began giving directives to Origin regarding its facility and increasingly took control of Origin's internal operations.

39. While negotiations were pending, Icelandic was made aware that Origin had three pending purchase orders for certain equipment. Those purchase orders were as follows:

a. A milk cream separator that cost roughly $396,000.00, was built in Italy, and was then stored in a warehouse in Wisconsin.

b. A filling machine for 30 oz yogurt products for $330,000.00.

c. A ultra filtration system (hereinafter the "New UF") that cost roughly 2.8 million dollars.

40. The above referenced purchase orders were entered into by Origin separate and

apart from the ongoing acquisition negotiations between Origin and Icelandic.

41. At the time of the negotiations, Origin had already qualified for $2.3 million in grants from the North Carolina Department of Agriculture for investment in the plant and had intended to utilize such grants to finance some of the purchase price of the above-mentioned equipment.

42. Icelandic expressed to Origin that, as the parties were moving forward with the acquisition, it needed to be further integrated into Origin's staff structure and to be given more control over Origin's staffing decisions.

43. Origin, based on Icelandic's representation that the acquisition was forthcoming, agreed to give Icelandic input on staffing decisions.

44. Icelandic thus became involved in the day-to-day minutiae of running the Origin facility including: (i) modifying Origin's staffing schedule and changed which employees were present when its product was being made, (ii) alter which specific plant managers would be present at the plant at what time and what employees would be present when its product was being made, and (iii) directing Origin to change the amount of chemicals used in cleaning the machinery.

45. As the negotiations continued, Icelandic demanded increasing amounts of control over the Origin production line to which Origin, at Icelandic's direction and based on Icelandic's representation that the acquisition was forthcoming, modified its plant and assembly line to fit primarily Icelandic's needs.

46. Icelandic directed the installation of the New UF in a point in the production line that required the removal of several other pieces of equipment and directly reduced Origin's ability to make double base ice cream and other products it had previously produced.

47. The direction of installing the New UF directly led to Origin having to forego a $6,000,000.00 annual contract with another vender.

48. The installation of the New UF in that space directed by Icelandic further required removal of Origin's vat pasteurization system which led to the loss of several ice cream customers of Origin that were dependent upon that system. Said removal required Origin to forego contracts worth $5,000,000.00 annually.

49. After modifying the plant per Icelandic's instructions, the quality of the product produced declined and Icelandic took responsibility for such failures and paid for the defect products.

50. As Origin's existing contracts came up for renewal, Icelandic directed that such contracts not be renewed.

51. Origin, acting on Icelandic's representation that the acquisition was forthcoming, opted to not renew its contracts with third parties which amounted to cancelled contracts in excess of $15,000,000.00.

52. Upon information and belief, Icelandic needed financing to fund the transaction with Origin.

53. While Icelandic was securing said financing, Icelandic had, in principle, agreed to during the due diligence period between signing of the letter of intent and closing on Icelandic's acquisition of Origin, to provide a $50,000 weekly bridge loan to Origin.

54. Origin stressed to Icelandic that this $50,000.00 was necessary to bridge the cash flow issues caused by Origin's non-renewal of contracts and ensure that it was able to retain key employees and equipment in the time period between due diligence and closing.

55. Icelandic never provided any bridge cash to Origin.

56. Rather, on June 11, 2025 Icelandic informed Origin it was no longer interested in purchasing Origin and that the only agreement they had was the Production Contract.

57. The pending chapter 11 case is precipitated by Origin's cancellation, at Icelandic's request, of over $15,000,000 in contracts, the bona fide dispute of ownership over certain equipment and machinery between Origin and Icelandic, the substantial changes to Origin's factory which have hindered its ability to maximize revenue and Origin's inability, due to Icelandic's actions, to satisfy certain alleged secured creditors.

**ORIGIN FOOD GROUP, LLC**

By: ______________________________

Print Name: Halil Ulukaya
Its: Manager